## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CIVIL NO. 10-418 (MJD/AJB)

LADORIS WILSON,

        PLAINTIFF,

v.

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

        DEFENDANT.

**REPORT & RECOMMENDATION
ON CROSS MOTIONS
FOR SUMMARY JUDGMENT**

---

Ethel J. Schaen, Schaen Law Office, 1821 University Avenue, Suite 344, South Saint Paul, MN 55104 (for Plaintiff);

Thomas A. Krause (pro hac vice), Thomas A. Krause, P.C., 4211 Grand Avenue, Suite 1, Des Moines, IA 50312 (for Plaintiff);

B. Todd Jones, United States Attorney, Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff LaDoris Wilson brings the present case, disputing Defendant Commissioner of Social Security's denial of her protective application for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before this Court, Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Based on the reasons set forth herein, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [Docket No. 11] be **GRANTED**; the Commissioner's Motion

for Summary Judgment [Docket No. 17] be **DENIED**; and the decision of the Administrative Law Judge be **REVERSED** and judgment be entered in favor of Plaintiff, thereby granting her benefits.

II.    FACTS

    a.  <u>Background</u>

Plaintiff was born on January 5, 1963, and was 43 years old at the time of her application for DIB and SSI on July 1, 2006.  (Tr. 88.)  At the time of Plaintiff's application, she lived in shared housing (Tr. 22.) Plaintiff graduated from high school and had one year of post-secondary education, studying computers or keyboarding. (Tr. 243, *see also* Tr. 369.) Prior to her alleged onset date, Plaintiff worked fulltime for three years in a clerical position, at which she filed documents, answered phones, typed, and answered questions from the public. (Tr. 120, 369.) Plaintiff was laid off from this position sometime in late December 2005 or early 2006. (Tr. 231.)

    b.  <u>Medical Records</u>

In 2005, Plaintiff was diagnosed with diabetes, hypertension, and hypercholesterolemia. (Tr. 289.) But, at that time, Plaintiff had recently lost 76 pounds, she lowered her LDL cholesterol dramatically, her blood pressure was "doing fabulous," and her labs results for her diabetes showed that "she's . . . [was] doing very well." (Tr. 289, *see also* Tr. 293.) All of these conditions were considered "under control." (Tr. 289.)

On March 27, 2006, Plaintiff was in a car accident. (Tr. 205.) Plaintiff was brought to the emergency room. (Tr. 219.) Later that same day, Plaintiff was admitted to the psychiatry ward for an assessment of psychosis. (Tr. 219.) Dr. Paul Andrew Travnicek detailed the following history:

History is very sketchy at best. It was put together by talking to police, as well as the nurse who took [the] report and also with the patient herself. As the story goes, this is a 43-year-old female who started a fire or there was a fire in her house earlier this evening, for which police/fire department arrived at the scene. On arrival at the scene, she was not there and they found her car parked a little ways away, which looked like she had driven it into a tree, but she was not in the car at the time. She state that she was driving this vehicle, was the belted driver. . . . She said that she did whack her head when the car crashed into the tree. There is also some report that the patient, when they did find her, was complaining of someone sitting on her chest.[1] When I ask her about this here in the emergency department, she denies it. . . . She does appear to be altered mentally at this time, but her speech is clear and she does give appropriate responses to my questions. Chart review of this woman doesn't reveal any mental health issues.

. . . .

She is alert and oriented but appears to be off with some of the comments and quotes that she says in the room. She also complains of someone pinching her nipples and the strikes out at people in the room, but she is pinching her own nipples. . . . She has clear speech. . . . Speech is clear.

. . . .

MEDICAL DECISION MAKING: Feel that this patient is definitely altered at this time. . . . Social work has seen the patient and do agree that there is definitely some sort of mental health issues at this time. Evidently the mother of the patient has been called and says that for the past month the patient has been "talking to the walls" and seems to be slipping mentally.

(Tr. 216-17; *see also* Tr. 239-40, 255-56.)

In the psychiatric ward, Plaintiff saw Dr. George Dawson, who noted as follows: Plaintiff reported that she recently lost her job as a receptionist; Plaintiff described calling her mother when she becomes panicked about her finances and then quickly forgets the contents of their conversations; Plaintiff described abnormal sleep patterns, decreased interest in activities and

---

[1] This is described in another report as follows: "[Plaintiff] was found by police yelling for them to get a 'guy off her' when nobody was there." (Tr. 226.)

decreased energy; Plaintiff reported problems with her concentration and "endorsed feeling hopeless and worthless"; and Plaintiff reported hearing voices that told her to drive her car into the tree. (Tr. 239-41.) Dr. Dawson diagnosed Plaintiff with psychosis, presenting with subacute onset of auditory command hallucinations to harm herself and "significant affective symptoms[,] including loss of interest, loss of enjoyment, low self-esteem and hopelessness"; with a cognitive disorder secondary to traumatic brain injury; and diabetes mellitus type 2; essential hypertension; and hypercholesterolemia. (Tr. 240-41.)

While she was admitted to the psychiatric ward, she experienced two to three generalized tonic clonic seizures, lasting about 40 seconds. (Tr. 222, 228, 354-55.) Plaintiff underwent radiological exams, which only revealed "[m]inimal nonspecific white matter changes" in her brain, which "[were] not likely of clinical significance." (Tr. 302; *see also* Tr. 299-301.) Plaintiff underwent an electroencephalogram (or EEG), which yielded findings consistent with a partial focal seizure disorder and metabolic encephalopathy.[2] (Tr. 310-11.)

While in the psychiatric ward, Plaintiff was seen for the facial injury she sustained in the accident by Dr. Derek Schmidt, an ear, nose, and throat specialist; she was seen for her seizures by Drs. Raluca Banica Wolters and Paula M. Cotruta, both neurologists; and she was seen by a pulmonologist.[3] (Tr. 215-16, 218-19.) Dr. Schmidt noted that while Plaintiff had difficulty making eye contact and cooperating, she was able to cooperate enough for him to conduct an examination. (Tr. 215.) Dr. Schmidt also noted that Plaintiff's mother reported that Plaintiff "had

---

[2] "An electroencephalogram (EEG) is a test to detect problems in the electrical activity of the brain." EEG: MEDLINEPLUS MEDICAL ENCYCLOPEDIA, http://www.nlm.nih.gov/medlineplus/ency/article /003931.htm.

[3] The pulmonologist noted that Plaintiff appeared to have "very mild hilar and mediastinal adenopathy." (Tr. 223.) Plaintiff had frequent medical appointments relative this condition, but these have not been discussed within this summary because they are not relevant to Plaintiff's application.

a difficult month with increasing psychosis[,] . . . and set her place on fire and had a self-caused motor vehicle collision." (Tr. 215.)  On April 3, 2006, Dr. Wolters noted that Plaintiff "follows commands appropriately, however, she is slow and not fully cooperative with the exam. She knows the name of the president. She can spell world forward and backward.  Memory was 3/3 at 1 minute and 0/3 at 5 minutes." (Tr. 225; *see also* Tr. 227.) On April 10, 2006, Dr. Cotruta noted that Plaintiff's "[i]mmediate memory is 3 out of 3 . . . [and s]hort-term memory was 2 out 3 at 5 minutes." and Plaintiff "[c]ould not assess calculation" and was "somewhat somnolent/appeared tired during the interview." (Tr. 232.)

While in the psychiatric ward, Plaintiff was started on a medication regimen and Plaintiff was showing signs of improvement the next day. (Tr. 220.) Eventually Plaintiff was taking Zocor,[4] Glucohage,[5] lisinopril,[6] Avandia,[7] Geodon,[8] Depakote,[9] amlodipine,[10] lorazepam,[11] and atenolol.[12] (Tr. 220.)

---

[4] Zocor is a brand name for simvastatin, a drug used to high cholesterol. SIMVASTATIN: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html.

[5] Glucophage is a brand name for metformin, which "is used alone or with other medications, including insulin, to treat type 2 diabetes." METFORMIN: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html.

[6] "Lisinopril is used alone or in combination with other medications to treat high blood pressure." LISINOPRIL: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html.

[7] Avandia is a brand name for rosiglitazone, which "is used along with a diet and exercise program and sometimes with one or more other medications to treat type 2 diabetes." ROSIGLITAZONE: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699023.html.

[8] Geodon is a brand name for ziprasidone, which "is used to treat the symptoms of schizophrenia . . . [and] to treat episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen together)."

Plaintiff was discharged from the psychiatric ward on April 28, 2006. (Tr. 218-20.) Roger Valentine, a nurse practitioner acting under the supervision of Dr. George Dawson, noted in his discharge forms that Plaintiff's "thought processes were intact but seemed blocked at times," her "[i]nsight still remains impaired" despite the reduction in hallucinations and delusions, and her "[j]udgment is questionable." Mr. Valentine also noted:

> [Occupational therapy] cognitive performance testing occurred on 04/06/06.  It indicated she needs to live in a structured supervised living situation with medication monitoring.  She will need assistance with money management. A case manager should be assigned. She should be monitored for follow through with activities of daily living. . . . [S]he was having some trouble with her memory but that and her psychotic symptoms slowly improved over the remainder of her hospital stay. Her insight and judgment are partially intact and the judgment is intact in a structured setting.

(Tr. 220-21; *see also* Tr. 226, 233-34, 245-47.) The Occupational Therapist noted that Plaintiff was "functioning at an Allen's Cognitive Level 4.2/5.6 [and] . . . [p]ersons function at this level display impaired memory and judgment, a decline in all areas of thinking and cannot manage to care for themselves independently." (Tr. 234.) This conclusion was sent to Drs. Dawson and Kim

---

ZIPRASIDONE: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html.

[9] Depakote is a brand name for valproic acid, which "is used alone or with other medications to treat certain types of seizures." VALPROIC ACID: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html.

[10] "Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina)." AMLODIPINE: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html.

[11] "Lorazepam is used to relieve anxiety." LORAZEPAM: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

[12] "Atenolol is used alone or in combination with other medications to treat high blood pressure." ATENOLOL: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html.

Cardenas. (Tr. 221.)  Dr. Jess Olson also reviewed this conclusion. (Tr. 227.)   At discharge, Plaintiff was diagnosed with the following relevant conditions: psychosis, cognitive disorder with continued deficits in autobiographical memory secondary to a traumatic brain injury, generalized tonic seizures, diabetes mellitus type 2, essential hypertension, and hypercholesterolemia. (Tr. 220.) Plaintiff was discharged to "Hovander house" and then transferred to "Hewitt house."[13] (Tr. 285, *see also* Tr. 220.)

On May 9, 2006, Plaintiff was seen by Dr. David Strike for a physical examination. (Tr. 285.) Dr. Strike noted that Plaintiff "is polite but appears somewhat aloof and a bit suspicious." (Tr. 285.) Dr. Strike also noted that Plaintiff will need at least quarterly visits to manage her diabetes and "[l]ikely will need med[ication] reconciliation again when she eventually goes home."[14] (Tr. 285.)

On May 26, 2006, Plaintiff was seen by Dr. Arshi Muhammad as part of a psychiatric diagnostic assessment. (Tr. 205-08.) He noted that Plaintiff would be moving to community housing. (Tr. 205, *see* n.13.) Plaintiff complained to Dr. Muhammad of memory problems and an inability to name objects. (Tr. 205.) During the examination it took Plaintiff two minutes of concentrated thought to correctly identify a desk. (Tr. 205.) Dr. Muhammad noted that Plaintiff "fade[d] off during the interview" and her speech was "at times . . . difficult to follow . . . because she move[d] back and forth in time and is not clear at moments." (Tr. 207.) But, he

---

[13] It was noted in another medical report that Plaintiff stayed at Hovander House for two weeks and was then moved to the Hewitt Crisis Residence for a 30-day contract bed, and after Hewitt she would be moving "into shared community housing." (Tr. 205.)

[14] "Medication reconciliation refers to the process of avoiding . . . inadvertent inconsistencies across transitions in care by reviewing the patient's complete medication regimen at the time of admission, transfer, and discharge and comparing it with the regimen being considered for the new setting of care." AHRQ Patient Safety Network – Patient Safety Primers, at "Medication Reconciliation," http://psnet.ahrq.gov/primer.aspx?primerID=1.

noted that her thought process seems to be tangential and "her insight and judgment into her illness is good because she is doing what has been prescribed for her and wants to do more in order to rehabilitate herself." (Tr. 207.) Plaintiff was diagnosed with organic brain syndrome after a traumatic brain injury, diabetes mellitus type II, hypertension, and seizures. (Tr.207.) Dr. Muhammad assessed Plaintiff's Global Assessment of Functioning as between 45 and 50.[15] (Tr. 207.) At the time Plaintiff was taking Celexa,[16] Depakote, Geodon, and Ativan. (Tr. 206.)

On May 27, 2006, Plaintiff was seen by Physician Assistant Kelly Adams in Regions Hospital's Emergency Department following a tonic-clonic seizure. (Tr. 213.) Plaintiff reported that this was the fourth seizure she had in her life.[17] (Tr. 213.) Plaintiff reported that she is taking her Depakote daily. (Tr. 213.)

On June 10, 2006, Plaintiff was treated by Dr. Ralph J. Frascone in Regions Hospital's Emergency Department following a seizure. (Tr. 210, *see also* Tr. 279-81.) On June 16, 2006, Plaintiff had a follow up appointment with Dawn M. Collins, a licensed practicing nurse, and it was noted that Plaintiff has been monitoring her blood sugar levels (for diabetes) and "they are doing well." (Tr. 282.)

---

[15] According to the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders, a GAF between 41 and 50 constitutes a "Serious symptoms . . . OR any serious impairment in social occupational, or school functioning (e.g., no friends, *unable to keep a job*)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994).

[16] Celexa is a brand name for citalopram, which "is used to treat depression." CITALOPRAM: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

[17] Plaintiff reported that "[s]he had new onset of seizures after being hospitalized for new onset psychosis when she tried to light her apartment on fire and also ran her car into a tree." (Tr. 213.)

On July 14, 2006, Plaintiff called Ramsey County Mental Health Center to request a refill of Depakote, which was denied because that prescription is handled by Plaintiff's neurology clinic. (Tr. 202.) On July 17, 2006, Plaintiff went to the Ramsey County Mental Health Center and saw Dr. Muhammad. (Tr. 199.) It was noted that Plaintiff's speech was "slow, but clear," her thought process was delayed, but linear, and her reasoning was good. (Tr. 199.) It was also noted that Plaintiff could not name the river that runs through Minnesota and was unable to name Hurricane Katrina. (Tr. 200.) It was concluded that Plaintiff's condition was improved and her medication compliance was good, notwithstanding the fact that Plaintiff did not call for a refill of Celexa after it had run out. (Tr. 199-200.)

In August 2006, Plaintiff saw Dr. Geoffrey J. Arlt, who examined Plaintiff and concluded that Plaintiff "most likely" had partial epilepsy and he concluded that there is not enough data to suggest that the motor vehicle accident or psychosis was caused by seizure. (Tr. 355.) Dr. Arlt noted that "[Plaintiff] keeps saying today the seizures are related to her lupus. I find no mention of lupus in the discharge or clinic notes. There is a phone note mentioning that someone told her that lupus could cause seizures as she was wondering if that could be what she has." (Tr. 354.) Dr. Arlt concluded: "[Plaintiff] seems fixed on lupus as the cause of seizures and the seizure was [the] cause of [the motor vehicle accident]. Data we have however, doesn't support this theory." (Tr. 356.) Also in August 2006, Dr. Cardenas, Plaintiff's primary physician, wrote a letter concluding that Plaintiff was currently unable to work due to her recent seizures, memory problems, and medication changes. (Tr. 421.)

In early October 2006, Plaintiff saw Dr. Muhammad and reported that her memory was "waxing and waning," but was good enough to enable her to cook, do laundry, and take care of herself. (Tr. 432.) Dr. Muhammad noted that Plaintiff could name the Mississippi river and the

current president; Plaintiff could also name the months backwards; but, Plaintiff responded that 100 minus seven equaled 30, and she could not do "serial sevens." (Tr. 432.)

On October 27, 2006, Plaintiff underwent a neuropsychological evaluation administered and interpreted by Erin G. Holker, Ph.D., L.P. (Tr. 336-40.) Dr. Holker's report on this visit was completed on November 14, 2006. (Tr. 339.)  At the evaluation, Plaintiff reported that, in March 2006, she lost consciousness while driving and was in a car accident; and Plaintiff also denied any history of psychiatric illness.[18] (Tr. 336.) Nevertheless, Plaintiff stated that she remembered "voices . . . saying negative things to her."  (Tr. 337.) At the time of the evaluation, Plaintiff was living in shared housing. (Tr. 336.) Plaintiff reported that since March 2006, she has had difficulty with her cognition. (Tr. 336.) Plaintiff reported, "[f]or instance, she has trouble remembering what she did as a child, or what happened last month.  At times, she has difficulty remembering what others have said and names of people with whom she is in shared housing. She has struggled with word-finding, somewhat more than usual." (Tr. 336.) But, Plaintiff handles her own finances, and a nurse visits weekly and assists with her medications. (Tr. 336.)

Dr. Holker also reported: "[Plaintiff] reminds herself to take the medications on a daily basis, apparently without difficulty. . . . [Plaintiff] cooks and does housework, apparently without difficulty." (Tr. 336.) Dr. Holker found that Plaintiff's "[o]verall intellectual functioning was estimated to be in the borderline range," "[c]onfrontation naming was mildly impaired for her age and education," "[e]xpressive vocabulary was mildy impaired," "[l]etter fluency was mildly slowed," "[a]ttention span was mildly impaired," "[d]ivided attention was moderately impaired, and was notable for prominent difficulty maintaining cognitive set," "[p]sychomotor processing

---

[18] Dr. Holker noted that Plaintiff had lupus. (Tr. 336.)  Dr. Holker also noted that there were no medical records available for his examination. Thus, it is likely that Plaintiff reported to Dr. Holker that she had lupus.  (*See* Tr. 356.)

speed was mildly slowed," "[c]onstruction of complex design was moderately impaired for her age, and was characterized by difficulty with placement of details and organization," "[n]ovel problem solving . . .was low average . . . , but was characterized by a preservative problem solving style and difficulty with conceptualization," and Plaintiff's recall for certain learning and recognition tasks was moderately impaired. (Tr. 337-39.) From these findings, Dr. Holker concluded as follows:

> Current results indicate overall intellectual functioning estimated to be in the borderline range, consistent with premorbid estimates based on single word reading abilities. Prominent impairments were noted in executive functioning, including impairments in problem solving, set shifting, perseverations, organization, and conceptualization.    Learning   and   memory   are   impaired, particularly for more attentionally-demanding material.  Finally, left-side motor functioning is also impaired.

>      . . . .

>      In terms of daily functioning, [Plaintiff] is currently living in shared housing and is hoping eventually to move back into independent living. Given her cognitive difficulties, she will likely do best with structure and routine. She may require minimal assistance with instrumental activities of daily living, including medication and financial management. If she has a case worker and/or social worker from whom to obtain support and who can assist in ensuring that she is adequately caring for herself, it may be possible for her to live independently.   She is likely to have difficulty remembering information, and may benefit from checklists and written reminders.  Her reading falls at the 5th grade level, however, so written information should be clear and concise, with this in mind.  Perhaps she would benefit from other types of reminders as well, such as alarms or telephone calls.  She may have difficulty organizing large, complex tasks, and others may assists by breaking down such tasks into smaller, more manageable parts. She may also have difficulty keeping track of more than one piece of information at a time, and may find it helpful to complete one task before beginning another.

(Tr. 338-39.)

On November 17, 2006, Plaintiff underwent an interim psychiatric diagnostic assessment. (Tr. 425-27.) The interim psychiatric diagnostic assessment was completed by Marcea Kjervick, R.N., M.S., C.S.[19] (Tr. 427.) Plaintiff reported that her mood was much improved as a result of her medications. (Tr. 425.) Plaintiff's energy was "okay," and she reported going to the library and using the computers, and talking to her family and her roommates. (Tr. 425.) Plaintiff stated that she wanted to join the YMCA in order to use the exercise equipment and wanted to take a cruise or take a computer class so she can work in computer programming. (Tr. 425.) Ms. Kjervick observed as follows: Plaintiff brought two coats with her, which Plaintiff said was to keep her warm at the bus stop; Plaintiff "had periodic eye contact, sat on the edge of her chair, and was exercising her right arm by doing bicep curls" and "did not seem to be aware of this behavior"; Plaintiff was "slightly belligerent" and "appeared slightly agitated . . . [and] exhibited restricted affect and euthymic mood." (Tr. 425-26.) Ms. Kjervick concluded that Plaintiff's short and long-term memory were fair and Plaintiff's "judgment and insight were poor to fair." (Tr. 426.) Ms. Kjervick concluded that "[i]f [Plaintiff] continues in her present living situation with structure and support, continues interacting with her family, takes her prescribed medications, her prognosis would be fair." (Tr. 426.)

In February 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 504.)   Plaintiff's medication compliance was characterized as good. (Tr. 504.)   Plaintiff's reasoning, judgment, insight, memory, and knowledge were fair. (Tr. 504.)

At the request of Dr. Roger Cornetto, in March 2007, Plaintiff underwent a Work Capacity/Functional Impairment Assessment administered by Dr. Fozia A. Abrar.  (Tr. 448.) The assessment only addressed Plaintiff's physical capacity to work. (Tr. 451.)  Plaintiff reported

---

[19] This Court assumes that "C.S." stands for (Certified) "Clinical Specialist."

that she feels she would be able to work part-time with physical limitations. (Tr. 450.) After reviewing Plaintiff's medical documentation and considering his objective examination, Dr. Abrar concluded that Plaintiff has the functional capacity to perform light work. (Tr. 450-51.)

In April 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 501.) Plaintiff missed her March appointment because her mother passed away. (Tr. 501.) Plaintiff stated that when the phone rings, she hopes that it is her mother. (Tr. 501.) Plaintiff's medication compliance was characterized as fair. (Tr. 501.) It was noted that Plaintiff's reasoning, judgment, insight, concentration, memory, and knowledge were fair. (Tr. 501.) Plaintiff was assessed as having an increase in negative symptoms due to being angry, worried, and hurt by her mother's death. (Tr. 501.)

In May 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 498.) It was noted that Plaintiff's medication compliance was good. (Tr. 498.) Plaintiff's reasoning, judgment, insight, concentration, memory, and knowledge were fair. (Tr. 498.)  Plaintiff was assessed to have improved from her last visit. (Tr. 498.)

In August 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 495.) It was noted that Plaintiff's medication compliance was fair. (Tr. 495.) It was also noted that Plaintiff's reasoning and insight were fair. (Tr. 495.) Plaintiff was assessed to have had no change in her symptoms from her last visit. (Tr. 495.)

In October 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 493.) It was noted that Plaintiff's medication compliance was good. (Tr. 493.) It was also noted that Plaintiff's judgment, insight, memory, and knowledge were fair; Plaintiff's concentration and reasoning were good. (Tr. 493.) Plaintiff was assessed to have improved from her last visit because her anxiety had decreased. (Tr. 493.) In October 2007, Plaintiff also saw Dr. Krista K.

13

Graven for her mediastinal and hilar adenopthy, which Dr. Graven thought was likely sarcoidosis. (Tr. 520.) Dr. Graven noted:

> In the past we have had lengthy discussion about the etiology for sarcoidosis, definitive [diagnosis] and when it is typically treated. Today she asks similar questions as in the past and does not seem to remember these previous conversations.  I have also given her written information about sarcoidosis in the past and she is requesting the same information again.

(Tr. 520.)

In November 2007, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 490.) It was noted that Plaintiff's medication compliance was good. (Tr. 490.) It was also noted that Plaintiff's judgment, memory, knowledge, and concentration were fair; Plaintiff's insight and reasoning was good. (Tr. 490.)

In January 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 487.) It was noted that Plaintiff's reasoning, judgment, insight, memory, knowledge, and concentration were fair. (Tr. 487.) But, Plaintiff's mood was sad and her affect was depressed. (Tr. 487.) Plaintiff was assessed as having an increase in negative symptoms due to a decline in her self-esteem. (Tr. 487.)

In February 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 486.) It was noted that Plaintiff's medication compliance was good, but she had "trouble getting her words out." (Tr. 286.) It was also noted that Plaintiff's reasoning, judgment, insight, memory, knowledge, and concentration were fair. (Tr. 486.) Plaintiff was assessed to be improved from her last visit. (Tr. 486.)  Plaintiff reported that she ceased exercising in January 2008. (Tr. 514.)

In March 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 485.) It was noted that Plaintiff's reasoning, judgment, and concentration were good; and her insight,

knowledge, and memory were fair. (Tr. 485.) It was also noted that Plaintiff had started going to the gym. (Tr. 485.) Plaintiff was assessed to be improved from her last visit. (Tr. 485.) In March 2008, Plaintiff was also seen by Dr. Arlt. (Tr. 509.)  Plaintiff's medications at this appointment were listed as atenolol, amlopine, lisinopril, Actos,[20] Zocor, Glucophage, zolpidem, hydrochlorothiazide, Celexa, naproxen, and Depakote. (Tr. 511.)

In April 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 548.) It was noted that Plaintiff's medication compliance was good. (Tr. 548.) It was also noted that Plaintiff's speech was slow; and her reasoning, judgment, insight, and memory were fair. (Tr. 548.) Plaintiff was assessed to have improved from her last visit. (Tr. 548.)

In August 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 546.) It was noted that Plaintiff's medication compliance was good. (Tr. 546.) It was also noted that Plaintiff's reasoning, judgment, insight, and memory were fair; Plaintiff's concentration and knowledge were good. (Tr. 546.) Plaintiff was assessed to have improved from her last visit. (Tr. 546.) In August 2008, Plaintiff also saw Dr. Cornetto and reported that she recently discovered she was eating during the night without recollection of having eaten. (Tr. 577.) Plaintiff reported that this behavior stopped when she ceased taking her sleep medication. (Tr. 577.)

In October 2008, Plaintiff was seen at the Ramsey County Mental Health Center. (Tr. 542.) Plaintiff reported that she is having difficulty sleeping. (Tr. 542-43.)  It was noted that Plaintiff was taking her medication as directed, and Plaintiff's judgment, insight, and memory were good. (Tr. 542.)  In October 2008, Plaintiff also saw Dr. Graven. (Tr. 575.) Dr. Graven's notes were identical to her notes quoted above for October 2007. (Tr. 575.)

---

[20] Actos is the brand name for pioglitazone, which "is used with a diet and exercise program and sometimes with other medications, to treat type 2 diabetes." PIOGLITAZONE: MEDLINEPLUS DRUG INFORMATION, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699016.html.

In November 2008, Plaintiff saw Dr. Arlt. (Tr. 565-567.) Plaintiff complained of memory loss and stated that she has trouble remembering past events and conversations. (Tr. 566.)

In January 2009, Ms. Kjervick completed a mental impairment questionnaire on Plaintiff's behalf. (Tr. 592-97.) Ms. Kjervick listed Plaintiff's diagnosis as major depressive disorder. (Tr. 592.) Plaintiff's symptoms included: poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, loss of intellectual ability, delusions and hallucinations, pervasive loss of interests, feelings of worthlessness, difficulty thinking or concentrating, oddities of thought and perception, time and place disorientation, emotional withdrawal or isolation, blunt affect, decreased energy pathological passivity, intrusive recollections of a traumatic experience, persistent irrational fears related to her health issues, generalized persistent anxiety, irritability, and forgetfulness. Plaintiff's current GAF was assessed to be 50 and her highest GAF in the last year was 51. (Tr. 593.) Ms. Kjervick assessed Plaintiff's prognosis as "fair for mental health." (Tr. 593.) Ms. Kjervick answered the following relevant question:

> **On average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work?**
> Difficult to say. She has cancelled or [has] not shown for 6 app[ointments] since 11/06.

(Tr. 593.) Based upon Plaintiff's missed appointments, Ms. Kjervick concluded that Plaintiff would be absent from work more than three times per month. (Tr. 594.) Ms. Kjervick assessed that Plaintiff's mental condition would make it difficult for her to travel to unfamiliar places or use public transportation. (Tr. 595.) Ms. Kjervick also assessed that Plaintiff has a moderate degree of limitation in her ability to engage in activities of daily living, a slight degree of limitation in her ability to maintain social functioning, and a marked degree of limitation in her

ability to maintain concentration. (Tr. 596.) Ms. Kjervick identified three episodes of

decompensation, each of extended duration. (Tr. 596.) Ms. Kjervick described Plaintiff as

follows:

> Patient has a medically-documented history of mental disorder of
> at least 2 years' duration that has caused more than a minimal
> limitation of ability to do basic work activities, with symptoms or
> signs currently attenuated by medication or psychosocial support.
>
>          . . . .
>
> Patient has a current history of 1 or more years' inability to
> function outside a highly supportive living arrangement, with an
> indication of a continued need for such an arrangement.

(Tr. 597.)

This Court's ability to interpret Ms. Kjervick's notes was hindered by the fact that they

were handwritten and illegible. This problem was also cited by the Administrative Law Judge

(ALJ) and vocational expert throughout their review of her notes during the hearing. (*See, e.g.,*

Tr. 27-29.)

### c.  **Evidence Arising from Plaintiff's Application for DIB**

#### i.  Plaintiff's Self-Description & Testimony

On July 6, 2006, during Plaintiff's interview in conjunction with her application, the

interviewer noted that Plaintiff had difficulty understanding, concentrating, and answering. (Tr.

116.) Plaintiff's alleged onset date is December 31, 2005, the day on which she was laid off. (Tr.

119.) Plaintiff contends that she is unable to work due to injuries that she sustained in a car

accident, lupus, diabetes, and her seizure condition. (Tr. 119.) Plaintiff reported in her

application as follows: she lives in a "boarding house" (Tr. 141); when she wakes up, she

showers, dresses, takes her medication, checks her blood sugar, and prepares breakfast (Tr. 141);

prior to her condition, she could drive and did not have trouble shopping and paying bills (Tr.

142); she has no problems with personal care (Tr. 142); a nurse needs to remind her about taking her medication and help her make medical appointments (Tr. 143); Plaintiff prepares meals, does laundry, and washes dishes (Tr. 143); Plaintiff only goes outside "when needed" because she is fearful of having a seizure (Tr. 144); when Plaintiff goes outside, she walks or uses public transportation alone (Tr. 144); Plaintiff is able shop and manage money (Tr. 145); Plaintiff enjoys watching television and completing "word finds" (Tr. 145); Plaintiff spends no time with others (Tr. 145); Plaintiff can walk six blocks and pay attention for one half hour. (Tr. 146.)  In her follow-up report, Plaintiff reported that her headaches are worsening and she is constantly fatigued because she has difficulty sleeping. (Tr. 174-81.)

In support of Plaintiff's application, Plaintiff's brother described Plaintiff's living situation as a "group home" with other residents (Tr. 152) and Plaintiff's brother reported that Plaintiff needs to be reminded to take her medications. (Tr. 154.) Except as mentioned, Plaintiff's brother described Plaintiff's functional capacity similar to Plaintiff's self-description. (Tr. 152-59.)

Plaintiff testified at the hearing that she was currently living in "shared housing." (Tr. 21.) The hearing before the ALJ was held on February 10, 2009. The address that she gave at the hearing was the same as the address listed on forms directed to and sent from the Commissioner in July 2006 (Tr. 90, 91, 93), November 2006 (Tr. 33, 34, 42, 44, 47), March 2007 (Tr. 57, 61), January 2009. (Tr. 72.)

ii.   Consultative Examination

On October 10, 2006, Plaintiff saw Dustin J. Warner, Psy.D, L.P., who conducted a consultative examination of Plaintiff. (Tr. 369.) Mr. Warner found as follows: Plaintiff has no other history of hospitalization or mental health treatment prior to the accident (Tr. 369);

Plaintiff lives in a shared housing residence (Tr. 370); Plaintiff's daily routine consists of showering, cooking and eating meals, making her bed, brushing her teeth, dressing, taking her medication "independently," attending scheduled appointments, "moving items into the share residence," and watching television (Tr. 370); and some days Plaintiff goes grocery shopping, does cleaning chores, and does laundry. (Tr. 370.)

Dr. Warner further found as follows: Plaintiff's mental status was normal, with the exception that Plaintiff's speech was somewhat slow in response to questions posed to her and there seemed to be some mild indications of central dysarthria (Tr. 370); Plaintiff's affect was blunted and her mood was depressed (Tr. 370); Plaintiff could recall five digits forward and three digits backwards, and could recall two of three objects after five and 30 minute delays, but Plaintiff's numeric reasoning was moderately delayed (Tr. 370); Plaintiff's general fund of information was in the low average range (Tr. 370); Plaintiff's word association skills were mildly impaired (Tr. 370); Plaintiff's insight and judgment were good (Tr. 370); Plaintiff's remote memory was intact (Tr. 370); Plaintiff's I.Q. scores place her within the borderline range for intellectual functioning (Tr. 371); and overall Plaintiff's "memory scores were as good as, or better than the scores obtained on the intellectual measure."  (Tr. 371.)

Based upon the aforementioned findings, Mr. Warner diagnosed Plaintiff with depressive disorder and borderline intellectual functioning (Tr. 372.) Mr. Warner concluded Plaintiff's prognosis was "fair, at best," and "[g]iven [Plaintiff's] numerical reasoning, she was not judged capable to manage her own funds." (Tr. 372.) Nevertheless, Mr. Warner thought that Plaintiff "could carry out work-like tasks of a simple and concrete nature, at a reasonable pace and persistence" and "could certainly do routine repetitive work," "could respond appropriately to

brief and superficial contact with coworkers and supervisors" and "could tolerate stress and pressure typically found in an entry level work place." (Tr. 372-73.)

        iii.  <u>Physical and Mental Residual Functional Capacity Assessments &</u>
            <u>Psychiatric Review Technique</u>

In September 2006, Plaintiff underwent a physical residual functional capacity assessment, which established no exertional, manipulative, visual, or communicative limitations. (Tr. 324-31.) The only limitations established were that Plaintiff must never climb ladders, ropes, and scaffolds, and Plaintiff must avoid all exposure to hazards. (Tr. 326, 328.) The medical consultant noted that there was no treating or examining source statements regarding Plaintiff's physical capacities. (Tr. 330.)

In November 2006, R. Owen Nelsen, Ph.D., L.P., performed a psychiatric review technique, and concluded that a residual functional capacity assessment was necessary because Plaintiff had documentation of factors that evidence an organic mood disorder. (Tr. 402.) Plaintiff was noted as having a disturbance of mood and Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria of organic mood disorder, including borderline intellectual functioning following her car accident. (Tr. 402.) Dr. Nelsen found that Plaintiff's activities of daily living were mildly restricted and Plaintiff had moderate difficulties maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 411.) Dr. Nelsen found that Plaintiff had no episodes of decompensation of extended duration. (Tr. 411.) Dr. Nelsen concluded that Plaintiff had a severe impairment, but it does not qualify as a listing impairment. (Tr. 413.)

In November 2006, Dr. Olsen also conducted a mental residual functional capacity assessment. (Tr. 415.)  Dr. Olsen based his assessment on Dr. Warner's statement. (Tr. 417.) Dr.

Olsen found that Plaintiff was markedly limited in her "ability to understand and remember detailed instructions" and her "ability to carry out detailed instructions." (Tr. 415.) Dr. Olsen found that Plaintiff was moderately limited in her ability to do the following: "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "work in coordination with or proximity to others without being distracted by them"; "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods"; "interact appropriately with the general public"; and "respond appropriately to changes in work setting." (Tr. 415-16.) Dr. Olsen concluded Plaintiff would be markedly impaired in her ability to execute detailed or complex/technical instructions and Plaintiff would need infrequent and superficial contact with co-workers. (Tr. 417.)

Plaintiff's records were reviewed by state consultants again in March 2007 following her petition for reconsideration and the original determinations were affirmed. (Tr. 439-444.)

### iv.   Vocational Expert

The ALJ presented the vocational expert with a hypothetical individual who meets the description of Plaintiff given by Ms. Kjervick. (Tr. 27-28.) The vocational expert testified that such an individual could not perform Plaintiff's past work or any other work in the regional or national economy. (Tr. 29.) The ALJ presented the vocational expert with a hypothetical individual who meets the description of Plaintiff given by Dr. Warner. (Tr. 29.) The vocational expert testified that such an individual could not perform Plaintiff's past work, but could perform work as a polisher or cuff folder, of which there are 3,000 jobs and 1,200 jobs in Minnesota respectively. (Tr. 29-30.)

**d.  <u>Procedural Posture</u>**

On July 1, 2006, Plaintiff filed her protective application for DIB and SSI. (Tr. 9.) Plaintiff alleged an onset date of December 31, 2005. (Tr. 9.) Plaintiff's applications were denied on November 7, 2006, and upon reconsideration on March 26, 2007. (Tr. 9; *see also* Tr. 44, 57-58.) Thereafter, Plaintiff requested a hearing before an ALJ. (Tr. 62-63.) On February 10, 2009, Plaintiff had a hearing before ALJ Michael D. Quayle. (Tr. 9.)

The ALJ found and concluded as follows: Plaintiff has not engaged in substantial gainful activity since December 31, 2005; Plaintiff has the severe impairments of depression and borderline intellectual functioning; Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02 or 12.04; Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the nonexertional limitations; Plaintiff is unable to perform her past relevant work; considering Plaintiff's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and therefore, Plaintiff has not been under a disability within the meaning of the Social Security Act from December 31, 2005, through March 29, 2009. (Tr. 9-16.) In finding that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02 or 12.04, the ALJ discounted the opinion of Ms. Kjervick because she is not a doctor; she exaggerated Plaintiff's limitations when she concluded that Plaintiff had three episodes of decompensation, which is unsupported by the evidence; and Plaintiff's I.Q. score refutes Ms. Kjervick's conclusion. (Tr. 13.)

On March 26, 2009, Plaintiff requested a review of the ALJ's decision. (Tr. 1.) The Appeals Counsel denied Plaintiff's request for review on January 29, 2010. (Tr. 1.)

III.   **ANALYSIS**

a.   **Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. §§ 405(g), 1383(c)(3); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199. In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993).  If it is possible to reach two inconsistent positions from the evidence, then the court must affirm that decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. §§ 423(a)(E), 1382(a)(1).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

Plaintiff challenges the ALJ's determination, arguing that the ALJ failed to consider whether Plaintiff's condition met or equaled listing 12.02C3 and the ALJ failed to consider the opinions of Ms. Marcea Kjervick, R.N., M.S., C.S. For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment be granted.

### b.  Listing 12.02: Chronic Organic Mental Disorder

At step three in the sequential analysis, the ALJ must consider whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant bears the burden of establishing the impairment is a disabling impairment (i.e., meets or equals listed

24

impairmen). *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. §§ 404.1526(a), 416.926(a). A finding that an impairment equals a listing must be based on medical evidence; symptoms alone are insufficient. 20 C.F.R. §§ 404.1526(b), 416.926(b); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir.2008); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhardt*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

A "disabling impairment" under listing 12.02 is an impairment that is characterized by "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02. The required level of severity is met, when the individual has a

> [m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> . . . .
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement,[21] with an indication of continued need for such an arrangement.

---

[21] "[A] highly supportive living arrangement" is discussed, in relevant part, as follows:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02C.

The ALJ stated: "The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. 13.) Plaintiff contends that the ALJ's conclusion that the evidence fails to meet "paragraph C" criteria is unsupported by substantial evidence because Plaintiff has a history of one or more years' inability to function outside of a highly supportive living arrangement and she has a continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02C3.

Defendant contends there is no evidence in the record to support that Plaintiff was living in shared housing at the time of the hearing. (Def.'s Mem. 15-16.) This assertion is incorrect. The record evidence is undisputed: Plaintiff was discharged from the psychiatric ward in April 2006 into a shared housing (or group-living) environment. The evidence in the record only supports the conclusion that Plaintiff's housing environment has not changed materially from

---

factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.00F.

when she was discharged from the hospital in April 2006.[22]  Her present setting is a highly supportive living arrangement because it is a group-living setting, Plaintiff's living needs are met by the government and managed by a social worker, and Plaintiff receives help from a nurse on a weekly basis.

Defendant argues in the alternative that even if Plaintiff was living in a shared housing environment, Plaintiff's own statements support that she was living "independently" and her living environment was more akin to having roommates than living in a group-home setting. The first problem this argument is that Plaintiff's "significant mental limitations" make her a poor self-reporter and the ALJ found that Plaintiff was not credible. (Tr. 14.) This Court finds it particularly noteworthy that Plaintiff reported in the emergency room in 2006 that she was responding to internal stimuli when she drove her car into a tree, and yet, Plaintiff has, subsequently, denied making this statement and denied being under the influence of internal stimuli when she drove her car into a tree. In addition, Plaintiff has also told many medical providers that she has lupus, when there is no medical evidence to support that she has had this condition. While Plaintiff's assertions that about her activities of daily living and her aspirations to study, work, and travel are admirable, they should be viewed with skepticism.

The second problem with relying on Plaintiff's own statements is that they are inconsistent with the opinions of acceptable medical sources. The occupational therapist who examined Plaintiff opined that Plaintiff would not be able to live independently. This finding was noted by a nurse practitioner and reviewed by Plaintiff's treating doctors at Regions Hospital. Based upon this recommendation, Plaintiff was discharged to Hovander House, later move to

---

[22] Plaintiff was discharged to Hovander house and later moved to Hewitt house. In May 2006, Dr. Muhammad noted that Plaintiff would be moving to "community housing." The record shows that Plaintiff has consistently lived in the same location since at least July 2006.

Hewitt House, and later moved to "community housing." She was in community housing when

Dr. Holker concluded:

> In terms of daily functioning, [Plaintiff] is currently living in shared housing and is hoping eventually to move back into independent living. Given her cognitive difficulties, she will likely do best with structure and routine. She may require minimal assistance with instrumental activities of daily living, including medication and financial management. If she has a case worker and/or social worker from whom to obtain support and who can assist in ensuring that she is adequately caring for herself, it may be possible for her to live independently.

This conclusion was echoed by Ms. Kjervick in late 2006, when she concluded: "If [Plaintiff]

continues in her present living situation with structure and support, continues interacting with her

family, takes her prescribed medications, her prognosis would be fair." Ms. Kjervick repeated

this conclusion in her 2007 evaluation. Even giving deference to the ALJ's determination that

Ms. Kjervick's opinion should be afforded lesser weight, there are no medical opinions in the

record that contradict the conclusions of Dr. Holker and Ms. Kjervick that Plaintiff is unable to

function outside of her highly supportive living arrangement.[23]  *See infra* III.c. (recommending

that the ALJ's determination that Ms. Kjervick's opinion be afforded lesser weight be remanded

for reconsideration).

The ALJ gave the most credit to the opinions of Drs. Warner and Holker. Their opinions

support that Plaintiff has had a chronic organic mental disorder for at least two years' duration

that has caused more than a minimal limitation of ability to do basic work activities, but neither

of their opinions supports that Plaintiff is able to function outside of a highly supportive living

arrangement.  Dr. Holker's opinion expressed that Plaintiff could *only possibly* transition to

independent living *if* certain conditions were met.  These conditions can be characterized as

---

[23] The ALJ does not appear to have rejected this opinion of Ms. Kjervick.

"highly supportive" and thus, Dr. Holker's opinion only supports the conclusion that Plaintiff cannot live independently.  Dr. Warner's opinion is consistent with this conclusion to the extent that he concluded that Plaintiff prognosis was "fair, at best" and she cannot manage her own finances.   Dr. Warner did not offer any further opinion about Plaintiff's ability to live independently.

This Court's review of the record finds no substantial evidence to support the ALJ's conclusion that Plaintiff has the ability to function outside of a highly supportive living arrangement or will be able to do so in the future.  The only evidence in the record supports that Plaintiff has been unable to function outside of such a setting and there is no evidence in the record to support that she will be able do so in the future.

Therefore, given the record and circumstances of this case, remand is unnecessary and would only delay benefits. *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000); *see also Cline v. Sullivan*  939 F.2d 560, 569 (8th Cir. 1991) (holding that "where the total record convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate"). Thus, for the reasons set forth herein, this Court recommends that the ALJ's decision be reversed and judgment be entered in favor of Plaintiff, thereby granting her disability benefits.

### c.   Ms. Kjervick's Opinion

It appears that the ALJ only afforded Ms. Kjervick's opinion less weight for those issues where her opinion differed from Drs. Warner and Holker's opinions.  The ALJ's decision to give Ms. Kjervick's opinion less weight raises a number of issues. On the one hand, the opinion of a treating nurse is not an "[a]cceptable medical source" as defined by 20 C.F.R. §§ 404.1513(a), 416.913(a). On the other hand, the Commissioner has recognized in a Social Security Ruling that

evidence from "other sources," such as a nurse acting as a therapist, should be accorded weight consistent with "the particular facts of the case, the source of the opinion, the issue(s) that the opinion is about, and many other factors." Social Security Ruling ("SSR") 06-03p, 71 Fed. Reg. 45593-03, 2006 WL 2263437 (Aug. 9, 2006).  Subsumed within the issue of what weight should be given to Ms. Kjervick's opinion is the mandate that an ALJ must "seek additional evidence or clarification from [a] medical source when the report from [that] medical source contains a conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information." 20 CFR §§ 404.1512(e)(1), 416.912(e)(1). In addition, the ALJ can ask a claimant to attend a consultative examination. 20 C.F.R. §§ 404.1512(f), 416.912(f). In some cases the ALJ must seek a consultative examination. Social Security Ruling (SSR) 96-6p requires that

> an [ALJ] . . . must obtain an updated medical opinion from a medical expert in the following circumstances:
>
> . . . .
>
> •   When additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

SSR 96-6p, 61 Fed. Reg. 34, 466, 1996 WL 374180 (July 2, 1996).

After reviewing the record and the ALJ's decision, this Court concludes that, based upon the facts in the present case, the ALJ erred in giving Ms. Kjervick's opinion less weight without first obtaining an updated medical opinion and seeking clarification from Ms. Kjervick (or the Ramsey County Mental Health Center).

The ALJ erred by not seeking an updated medical opinion. The reasons offered by the ALJ for discounting Ms. Kjervick's opinion were that she was not a doctor, she appeared to have exaggerated the extent of Plaintiff's condition, and her opinion was inconsistent with Plaintiff's

I.Q. Ms. Kjervick's report was created 14 months after Drs. Warner and Holker's reports were created. Neither Dr. Warner nor Dr. Holker had the benefit of reviewing each other's reports much less the 14 months of records that constitute additional medical evidence. For example, during this 14 month period of time Plaintiff missed numerous appointments with Ms. Kjervick. This fact contradicts Dr. Warner's finding that Plaintiff attends scheduled appointments. Furthermore, on two occasions Plaintiff was assessed to be doing worse than her previous visit, which supports Ms. Kjervick's assessment of decompensation and Drs. Warner's report is silent on the issue of decompensation. Moreover, Dr. Warner's report considered Plaintiff's I.Q. and described her prognosis as "fair, at best" and stated that she could not manage money on her own. While SSR 96-6p provides the ALJ's with discretion, the ALJ can abuse his or her discretion where there is not substantial evidence to support that the additional medical evidence would not "change the State agency medical or psychological consultant's finding that the impairment(s)." SSR 96-6p. In the present case, the ALJ erred by not concluding that the significant additional evidence "*may* change [Dr. Warner's] finding." *Id.* (emphasis added.)


[The remainder of this page was left intentionally blank.]

## IV.    RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that:

1.   Plaintiff's Motion for Summary Judgment [Docket No. 11] be **GRANTED** and the order

of the Administrative Law Judge be **REVERSED**;

2.   Commissioner's Motion for Summary Judgment [Docket No. 17] be **DENIED**; and

3.   Judgment be entered in favor of Plaintiff, thereby granting her benefits.


Dated: _____2/11/11_____          _____s/ Arthur J. Boylan_____
                                    Arthur J. Boylan
                                    Chief Magistrate Judge
                                    United States District Court
                                    for the District of Minnesota


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before _____February 26, 2011____.